HARRISON, REGIONAL ADMINISTRATOR, ENVIRON-
MENTAL PROTECTION AGENCY, ET AL. *v.*
PPG INDUSTRIES, INC., ET AL.

No. 78–1918.   Argued January 16, 1980—Decided May 27, 1980

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, WHITE, MARSHALL, and POWELL, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 594. BLACKMUN, J., filed an opinion concurring in the result, *post*, p. 595. REHNQUIST, J., *post*, p. 595, and STEVENS, J., *post*, p. 602, filed dissenting opinions.

*Maryann Walsh* argued the cause for petitioners. With her on the briefs were *Solicitor General McCree, Assistant Attorney General Moorman, William Alsup, Jacques B. Gelin,* and *Michele B. Corash.*

*Charles F. Lettow* argued the cause for respondents. With him on the brief were *V. Peter Wynne, Jr., Oliver P. Stockwell,* and *Gene W. Lafitte.*

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 307 (b)(1) of the Clean Air Act (Act) provides for direct review in a federal court of appeals of certain locally and regionally applicable actions taken by the Administrator of the Environmental Protection Agency (EPA) under specifically enumerated provisions of the Act, and of *"any other final action* of the Administrator under '[the] Act . . . which is locally or regionally applicable." (Emphasis

580

added.) [1] The issue in this case is whether the Court of Appeals for the Fifth Circuit was correct in concluding that it was without jurisdiction under § 307 (b)(1) to entertain a petition for review in which PPG Industries, Inc. (PPG),

[1] Section 307 (b)(1) provides in full:

"A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 112, any standard of performance or requirement under section 111, any standard under section 202 (other than a standard required to be prescribed under section 202 (b)(1)), any determination under section 202 (b)(5), any control or prohibition under section 211, any standard under section 231, any rule issued under section 113, 119, or under section 120, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this Act may be filed only in the United States Court of Appeals for the District of Columbia. *A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111 (d), any order under section 111 (j), under section 112 (c), under section 113 (d), under section 119, or under section 120, or his action under section 119 (c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977) or under regulations thereunder, or any other final action of the Administrator under this Act (including any denial or disapproval by the Administrator under title I) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit.* Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and publishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise." (Emphasis added.) § 307 (b)(1) of the Act, as added, 84 Stat. 1708, and amended by the Clean Air Act Amendments of 1977, Pub. L. 95–95, 91 Stat. 776, and the Clean Air Act Technical and Conforming Amendments, § 14 of Pub. L. 95–190, 91 Stat. 1404, 42 U. S. C. § 7607 (b)(1) (1976 ed., Supp. II).

and Conoco, Inc. (Conoco), the respondents here, challenged a decision of the Administrator concerning the applicability of EPA's "new source" performance standards to a power generating facility operated by PPG. More specifically, we must decide whether the Administrator's decision falls within the ambit of "any other final action" reviewable in a court of appeals under § 307 (b)(1).

## I

The dispute underlying this jurisdictional question involves a decision of the Administrator under § 111 of the Act, 42 U. S. C. § 7411 (1976 ed., Supp. II). That provision requires the Administrator to publish, and from time to time to revise, a list of categories of any stationary source that he determines "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare," § 111 (b)(1)(A), and to promulgate regulations establishing standards of performance for "new sources" within the list of those categories, § 111 (b)(1)(B). The Act defines a "new source" as "any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance under this section which will be applicable to such source." § 111 (a)(2).

In 1971, the Administrator included "fossil fuel-fired steam generators" in his list of stationary sources. 36 Fed. Reg. 5931. Later that year, pursuant to his mandate to promulgate "new source" performance standards, the Administrator established certain emission limits for any "fossil fuel-fired steam generating unit" of more than 250 million Btu's per hour heat input, the construction or modification of which was commenced after August 17, 1971, the date on which the standards were proposed. 40 CFR §§ 60.1–60.15, 60.40–60.46 (1979). These "new source" regulations define the term, "fossil fuel-fired steam generating unit," § 60.41 (a), and also create a procedure under which the Administrator, upon

request, will determine whether any action taken or planned by the owner or operator of a facility constitutes or will constitute "construction" or "modification" of the facility for purposes of triggering the applicability of the performance standards. § 60.5.

Sometime in 1970, the respondent PPG, a chemical manufacturing corporation, began the planning and preliminary construction of a new power generating facility at its plant in Lake Charles, La. That facility, designed to take advantage of fuel-efficient "cogeneration" technology, was to consist of two gas turbine generators, two "waste-heat" boilers, and a turbogenerator. The dispute between EPA and PPG concerns the applicability of the "new source" performance standards to the waste-heat boilers of this facility. This controversy first arose in 1975, when the respondent Conoco, PPG's fuel supplier, informed EPA that Conoco was switching the supply of fuel to the Lake Charles facility from natural gas to fuel oil. An exchange of correspondence ensued, initiated by EPA's request that PPG submit additional information bearing on whether the waste-heat boilers were covered by the "new source" standards. PPG's submissions revealed that although assembly of the waste-heat boilers had not begun until 1976, the new power facility itself, of which the boilers were an integral component, had been originally designed and partially ordered in 1970, a year before the proposed date of the "new source" performance standards.

On the basis of PPG's submissions, the Regional Director for Enforcement of the EPA notified PPG of his conclusion that the boilers were subject to the "new source" standards, since construction of the boilers themselves had not begun until long after January 14, 1971, the date on which the standards had been proposed. In response, PPG took the position that the boilers were part of an integrated unit, the construction of which had begun in 1970, before the proposed date of the standards. The Regional Director, nevertheless, reaffirmed his initial decision.

Pursuant to the procedure outlined in the "new source" regulations, 40 CFR § 60.5 (1979), PPG then submitted a formal request for an EPA determination that (1) the "new source" standards for "fossil fuel-fired steam generators" do not apply to the type of boilers in question, and (2) in any event, since construction of the facility of which the boilers were a part began before the date on which the standards were proposed, the boilers were not "new sources" and thus not subject to the performance standards. In the event that EPA determined that PPG's waste-heat boilers were subject to the standards, PPG also requested a clarification as to how those standards would apply.

Responding to PPG's request, the Regional Administrator notified PPG by letter that he had concluded that the waste-heat boilers were, indeed, subject to the "new source" standards for "fossil fuel-fired steam generators," and rejected PPG's argument that construction of the boilers had begun with the construction of other facets of the Lake Charles facility. Thus, the Regional Administrator affirmed the previous EPA determination that the waste-heat boilers were subject to the "new source" performance standards. With regard to the manner in which those standards were to apply to the waste-heat boilers, the Regional Administrator indicated that since PPG's gas turbine generators were not subject to the "new source" standards, PPG would be held accountable only for those emissions from the waste-heat boilers attributable to the combustion of fossil fuel, not those emissions attributable to waste heat from the gas turbine generators.[2]

---

[2] In a request for clarification, PPG expressed its understanding that the "new source" standards would not be applicable during the normal course of operation of the boilers, but only during performance tests or other periods when the boilers were operating on 100% fossil fuel. EPA by letter confirmed PPG's understanding. This position, however, was inconsistent with both the Regional Administrator's earlier ruling and with EPA's position in similar cases. Accordingly, an EPA representative notified PPG by telephone that the letter was incorrect. In a subsequent

PPG then filed a petition in the Court of Appeals for the Fifth Circuit, seeking review of EPA's decision concerning the applicability of the "new source" standards to its waste-heat boilers. Because of its uncertainty regarding the proper forum for judicial review, PPG also filed a complaint for injunctive relief against the Administrator in the United States District Court for the Western District of Louisiana. That suit has been stayed pending the disposition of the present case.

PPG's uncertainty, and the issue in this case, stem from conflicting views as to the proper interpretation of § 307 (b) (1) of the Act, 42 U. S. C. § 7607 (b)(1) (1976 ed., Supp. II). Before 1977, § 307 (b)(1) provided for exclusive review in an appropriate court of appeals of certain locally or regionally applicable actions of the Administrator under several specifically enumerated provisions of the Act. Actions of the Administrator under provisions not specifically enumerated in § 307 (b)(1) were reviewable only in a district court under its federal-question jurisdiction, 28 U. S. C. § 1331. Congress expanded the ambit of § 307 (b)(1) in 1977. The Clean Air Act Amendments of 1977, Pub. L. 95–95, 91 Stat. 776, added to the list of locally or regionally applicable actions reviewable exclusively in the appropriate court of appeals both (1) actions of the Administrator under another specifically enumerated provision of the Act, and (2) *"any other final action of the Administrator under [the] Act which is locally or*

letter, the Director of the Division of Stationary Source Enforcement of EPA reiterated that the "new source" standards would be applicable during the normal operation of the waste-heat boilers, but only to the extent that the boilers were operating on fossil fuel, rather than waste heat. The Director also indicated that, pursuant to the standards, PPG would be required to operate the boilers at all times with fuel containing less than a certain specified content of sulfur. He further noted that PPG would be required to install and operate opacity monitors in the stacks of the boilers and to perform alternative monitoring tests.

regionally applicable." (Emphasis added.) Later in 1977, in enacting the Clean Air Act Technical and Conforming Amendments, Pub. L. 95–190, 91 Stat. 1404, Congress added several more provisions to those listed in § 307 (b)(1) under which a locally or regionally applicable action of the Administrator is reviewable in the appropriate court of appeals.

It was under § 307 (b)(1), as amended, that PPG filed a petition for review in the Court of Appeals for the Fifth Circuit. Despite having filed its petition there, PPG, and Conoco as intervenor, argued that that court was without jurisdiction, since the Administrator's decision was not an action taken under one of the provisions specifically enumerated in § 307 (b)(1), and could not be properly characterized as "any other final action of the Administrator." The latter phrase, they argued, referred only to other locally or regionally applicable final actions under the provisions of the Act specifically enumerated in § 307 (b)(1). In response, EPA argued that the phrase, "any other final action," should be read literally to mean *any* final action of the Administrator.

The Court of Appeals concluded that the Administrator's decision did not fall within the meaning of "any other final action" under § 307 (b)(1). 587 F. 2d 237. It was the court's view that "[i]f Congress intended . . . to cast the entire responsibility for reviewing all EPA action under the Act into the courts of appeals, the numeration of specific sections would appear to be redundant." *Id.*, at 243. The "most revealing" aspect of the legislative history of § 307 (b)(1), the court thought, was the complete absence of any discussion of such a "massive shift" in jurisdiction. Moreover, the court found it unlikely that Congress could have intended a shift of jurisdiction that would require the courts of appeals to review decisions of the Administrator that simply applied or interpreted his regulations, as in this case. Such a decision, the court noted, is often based on a "skeletal record" that may leave the reviewing court unable to

perform meaningful judicial review. Since an appellate court is ill-suited to augment such a record, especially when compared to a trial court in which the tools of discovery are available, the court concluded that "[w]hatever addition to the jurisdiction of the courts of appeals Congress may have contemplated by adding the 'any other final action' language to § 307 (b) (1), we assume that section was drafted with the mechanical limitations of the courts of appeals in mind." 587 F. 2d, at 245. Accordingly, the Court of Appeals dismissed PPG's petition for lack of jurisdiction under § 307 (b)(1). We granted certiorari, 444 U. S. 823, because of the importance of determining the locus of judicial review of the actions of EPA.

## II

It is undisputed that the Administrator's decision concerning the applicability of the "new source" performance standards to PPG's waste-heat boilers was locally applicable action under a provision of the Act not specifically enumerated in § 307 (b) (1). The question at issue is whether the Administrator's decision falls within the scope of the phrase, "any other final action of the Administrator," so as to make that decision reviewable in a federal court of appeals under § 307 (b)(1).

At the outset, we note that the parties are in agreement that the Administrator's decision was "final action" as that term is understood in the context of the Administrative Procedure Act and other provisions of federal law. It is undisputed that the Administrator's ruling represented EPA's final determination concerning the applicability of the "new source" standards to PPG's power facility. Short of an enforcement action, EPA has rendered its last word on the matter. The controversy thus is not about whether the Administrator's decision was "final," but rather about whether it was *any other* final action" within the meaning of § 307 (b) (1), as amended in 1977.

## A

The petitioners argue that the phrase, "any other final action," should be construed in accordance with its literal meaning so as to reach *any* action of the Administrator under the Act that is "final" and not taken under a specifically enumerated provision in § 307 (b)(1). The respondents argue that the statutory language should be construed more narrowly. Relying on the familiar doctrine of *ejusdem generis,* they assert that the phrase, "any other final action," should be read not to reach all final actions of the Administrator, but rather only those similar to the actions under the specifically enumerated provisions that precede that catchall phrase in the statute.[3] The similarity that the respondents discern among the actions under the specifically enumerated provisions in § 307 (b)(1) is that those actions must be based on what the respondents refer to as "a contemporaneously compiled administrative record," by which they mean a record "based on administrative proceedings reflecting at least notice and opportunity for hearing." Since the Administrator's informal decision in this case was not based on such a record, the respondents argue that his decision was not "other final action" within the meaning of § 307 (b)(1) and thus not within the jurisdiction of the Court of Appeals.[4]

---

[3] The respondents have abandoned the construction of the statute they advanced in the Court of Appeals, namely, that the phrase, "any other final action," refers only to other final actions under those provisions specifically enumerated in § 307 (b)(1). That construction, as the Court of Appeals correctly noted, is inconsistent with the fact that the phrase, "any other final action," is modified not by "under these sections," but rather by "under this Act."

[4] It would appear that the respondents' construction of the statute is that adopted by the Court of Appeals, although the matter is not free from doubt. The doubt arises from the fact that the Court of Appeals' opinion can also be read as establishing a jurisdictional test that turns on a case-by-case inquiry into the adequacy of the administrative record. But, as the respondents themselves acknowledge, that reading of the opinion would create excessive uncertainty as to the proper forum for judicial review.

The respondents' reliance on the rule of *ejusdem generis* is, we think, misplaced in two respects. Under the rule of *ejusdem generis,* where general words follow an enumeration of specific items, the general words are read as applying only to other items akin to those specifically enumerated. Applying this rule to § 307 (b)(1), the respondents argue that "any other final action" must refer only to final actions based on an administrative record reflecting at least notice and opportunity for a hearing. The flaw in this argument is that at least one of the specifically enumerated provisions in § 307 (b)(1), namely, § 112 (c) of the Act, 42 U. S. C. § 7412 (c) (1976 ed., Supp. II), does not require the Administrator to act only after notice and opportunity for a hearing. In fact, the respondents themselves recognize that an action by the Administrator under § 112 (c) would be based on an administrative record not unlike that involved in this case.[5] Thus, even if the rule of *ejusdem generis* were applied, it would not significantly narrow the ambit of "any other final action" under § 307 (b)(1).

The second problem with the respondents' reliance on the rule of *ejusdem generis* is more fundamental. As we have often noted: " 'The rule of *ejusdem generis,* while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty.' " *United States* v. *Powell,* 423 U. S. 87, 91, quoting *Gooch* v. *United States,* 297 U. S. 124, 128. With regard to § 307 (b) (1), we discern no uncertainty in the meaning of the phrase, "any other final action." When Congress amended the pro-

---

[5] The respondents argue that this exception should be ignored in applying the rule of *ejusdem generis,* since § 112 (c) governs the regulation of "hazardous air pollutants" for which Congress may have wanted "special review" in the courts of appeals, even in the absence of procedures requiring notice and opportunity for a hearing. It is our view, however, that if the rule of *ejusdem generis* is applicable, it must be applied to actions under *all* the specifically enumerated provisions in § 307 (b)(1), not simply those that fit the respondents' theory.

vision in 1977, it expanded its ambit to include not simply "other final action," but rather *"any* other final action." This expansive language offers no indication whatever that Congress intended the limiting construction of § 307 (b)(1) that the respondents now urge. Accordingly, we think it inappropriate to apply the rule of *ejusdem generis* in construing § 307 (b)(1). Rather, we agree with the petitioners that the phrase, "any other final action," in the absence of legislative history to the contrary, must be construed to mean exactly what it says, namely, *any other* final action.[6]

## B

We have found nothing in the legislative history to support a conclusion that the phrase, "any other final action," in § 307 (b)(1) means anything other than what it says.

---

[6] The respondents raise several objections to so literal a reading of § 307 (b)(1), none of which we find persuasive. First, the respondents assert that such a construction of § 307 (b)(1) is both internally inconsistent and inconsistent with another provision of the Act. The internal inconsistency is said to arise from the fact that if the phrase, "any other final action," were construed to include *any* final action of the Administrator, it would nullify the express exception from review in § 307 (b)(1) of any "standard required to be prescribed under section 202 (b)(1)." The inconsistency with another provision in the Act is said to arise from the fact that a literal reading of "any other final action" would effectively repeal another judicial review provision in the Act, § 206 (b)(2)(B), 42 U. S. C. § 7525 (b)(2)(B) (1976 ed., Supp. II). These objections fall far short of the mark, however, for the general language of the catchall phrase, "any other final action," must obviously give way to specific express provisions in the Act.

The respondents also argue that if Congress had intended the phrase, "any other final action," to refer to *all* final actions of the Administrator, it would have been unnecessary, in 1977, to add to the list in § 307 (b)(1) of specifically enumerated provisions under which actions of the Administrator are reviewable in the courts of appeals. This may be true, but the fact remains that even if Congress had intended the phrase, "any other final action," to be read, as the respondents urge, in accordance with the rule of *ejusdem generis,* there still would have been no necessity to add to the list of specifically enumerated provisions.

Congress added the language, "any other final action," to § 307 (b) (1) in the Clean Air Act Amendments of 1977. The phrase first appeared in H. R. 6161, 95th Cong., 1st Sess. (1977). That bill, as reported out of the House Committee on Interstate and Foreign Commerce, expanded the jurisdiction of the Court of Appeals for the District of Columbia Circuit to include review of not only certain EPA actions of nationwide consequences under specifically enumerated provisions of the Act, but also "any other nationally applicable regulations promulgated, or final action taken, by the Administrator under [the] Act." In parallel fashion, the bill expanded the jurisdiction of the regional courts of appeals to include review not only of certain local or regional actions under specifically enumerated provisions, but also of *"any other final action* of the Administrator under [the] Act which is locally or regionally applicable." (Emphasis added.)

The only extended discussion of this proposed amendment to § 307 (b) (1) was contained in the Committee Report accompanying H. R. 6161. H. R. Rep. No. 95–294, pp. 323–324 (1977). That discussion, however, focused not on the jurisdictional question at issue here, but rather on the proper venue as between the District of Columbia Circuit and the other Federal Circuits. The Committee Report described the proposed amendments as "intended to clarify some questions relating to venue for review of rules or orders under the [A]ct." *Id.,* at 323. In this regard, the Committee Report explained:

"[The proposed addition to the first sentence of § 307 (b) (1)] makes it clear that any nationally applicable regulations promulgated by the Administrator under the Clean Air Act could be reviewed only in the U. S. Court of Appeals for the District of Columbia. . . .

"[The proposed addition to the second sentence] provides for essentially locally, statewide, or regionally applicable rules or orders to be reviewed in the U. S. court

of appeals for the circuit in which such locality, State, or region is located. . . ." *Ibid.*

The Committee Report further stated that the proposed changes reflected the Committee's agreement with certain venue proposals of the Administrative Conference of the United States, but added the caveat that the adoption of these proposals was not to be taken as an endorsement of the remainder of the Administrative Conference's recommendations. *Id.,* at 324.

The respondents infer from this scant legislative history that Congress never intended the addition of the phrase, "any other final action," to § 307 (b)(1) to enlarge the jurisdiction of the courts of appeals to include the review of cases based on an administrative record reflecting less than notice and an opportunity for a hearing. But, insofar as the respondents rely on what the Committee said in its Report, we fail to see how the Committee's observations on venue have any bearing at all on the jurisdictional issue now before the Court.[7] Moreover, since the Administrative Conference had not proposed that the jurisdiction of the courts of appeals be expanded to include "any other final action," the fact that the Committee expressly disclaimed an endorsement of the recommendations of the Administrative Conference on matters other than venue would appear wholly irrelevant.

The respondents also rely on what the Committee and the

---

[7] That the Committee intended the phrase, "any other final action," to result in at least some expansion of the jurisdiction of the courts of appeals is evident in the fact that the Committee Report expressly indicated that several types of nationwide actions under provisions not specifically enumerated in § 307 (b)(1) would be reviewable in the District of Columbia Circuit. See H. R. Rep. No. 95–294, pp. 323–324 (1977) (*e. g.,* regulations to carry out the nonattainment policy set out in § 117 of the Act). Thus, as even the respondents concede, the issue here is not whether Congress intended any expansion of the jurisdiction of the courts of appeals, but rather the extent to which Congress intended to expand that jurisdiction. As to that issue, the legislative history is silent.

Congress did *not* say about the 1977 amendments to § 307 (b)(1). It is unlikely, the respondents assert, that Congress would have expanded so radically the jurisdiction of the courts of appeals, and divested the district courts of jurisdiction, without some consideration and discussion of the matter. We cannot accept this argument. First, although the number of actions comprehended by a literal interpretation of "any other final action" is no doubt substantial, the number would not appear so large as ineluctably to have provoked comment in Congress. Secondly, it would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute. In ascertaining the meaning of a statute, a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark.[8]

## C

The respondents finally argue that, as a matter of policy, the basic purpose of § 307 (b)(1)—to provide prompt pre-enforcement review of EPA action—would be better served by providing for judicial review of cases such as this in a district court rather than a court of appeals.[9] It is the respond-

---

[8] Arthur Conan Doyle, The Silver Blaze, in The Complete Sherlock Holmes (1938).

[9] The respondents also argue that a literal construction of § 307 (b)(1) would violate due process of law. This argument turns on the interrelationship between § 307 (b)(1) and its companion provision, § 307 (b)(2), which provides that "[a]ction of the Administrator with respect to which review could have been obtained under [§ 307 (b)(1)] shall not be subject to judicial review in civil or criminal proceedings for enforcement." 42 U. S. C. § 7607 (b)(2) (1976 ed., Supp. II). To preclude a defendant in a civil or criminal enforcement proceeding from attacking the validity of informal action on the part of the Administrator would, in the respondents' view, violate the defendant's due process right to a "reasonable opportunity to be heard and present evidence." *Yakus* v. *United States,* 321 U. S. 414, 433. The short answer to the respondents' argument is that

ents' view that since agency action predicated on neither formal adjudication nor informal rulemaking is apt to be based on a record too scant to permit informed judicial review, the district court is the preferable forum, since the tools of discovery are there available to augment the record, whereas in a court of appeals a time-consuming remand to EPA might be required.

This is an argument to be addressed to Congress, not to this Court. It is not our task to determine which would be the ideal forum for judicial review of the Administrator's decision in this case. See, *e. g.*, Currie & Goodman, Judicial Review of Federal Administrative Action: Quest for the Optimum Forum, 75 Colum. L. Rev. 1 (1975). Rather, we must determine what Congress intended when it vested the courts of appeals with jurisdiction under § 307 (b)(1) to review "any other final action." The language of the statute clearly provides that a decision of the sort at issue here is reviewable in a court of appeals, and nothing in the legislative history points to any different conclusion.[10]

We add only that, as a matter of policy, this conferral of jurisdiction upon the courts of appeals is not wholly irrational. The most obvious advantage of direct review by a court of appeals is the time saved compared to review by a district court, followed by a second review on appeal. It may be seriously questioned whether the overall time lost by court of appeals remands to EPA of those cases in which the

---

the validity of § 307 (b)(2) is not at issue here. The constitutional question raised by the respondents must, therefore, await another day.

[10] The dissenting opinions would modify the language of § 307 (b)(1) so as to read either (1) any other final action similar to that under the specifically enumerated provisions other than those added in the Clean Air Act Technical and Conforming Amendments, *post,* at 600–602, or (2) any other final action expressly, but not impliedly, authorized under the sections of the Act not specifically enumerated in § 307 (b)(1), *post,* at 607. But neither the language of the statute nor its legislative history supports either of these proposed readings of § 307 (b)(1).

records are inadequate would exceed the time saved by forgoing in every case initial review in a district court. But whatever the answer to this empirical question, an appellate court is not without recourse in the event it finds itself unable to exercise informed judicial review because of an inadequate administrative record. In such a situation, an appellate court may always remand a case to the agency for further consideration.[11]

For the reasons stated, we hold that the Court of Appeals erred in dismissing the petition for want of jurisdiction. Accordingly, the judgment is reversed, and the case is remanded to the Court of Appeals for further proceedings consistent with this opinion.

*It is so ordered.*

Mr. Justice Powell, concurring.

I continue to have reservations about the constitutionality of the notice and review preclusion provisions of § 307 (b). *Adamo Wrecking Co.* v. *United States,* 434 U. S. 275, 289 (1978) (Powell, J., concurring); see *ante,* at 592–593, n. 9. Congress has extended to 60 days the period within which a petition for review may be filed under § 307 (b)(1). But publication in the Federal Register still is unlikely to provide constitutionally adequate notice that a failure to seek immediate review will bar affected parties from challenging the noticed action in a subsequent criminal prosecution. An informal exchange of letters, like those involved in this case, often will provide no greater protection. Although these constitutional difficulties well may counsel a narrow construction of § 307 (b)(1), cf. *Chrysler Corp.* v. *EPA,* 195 U. S. App. D. C. 90, 98–100, 600 F. 2d 904, 912–914 (1979) (parallel provisions of Noise Control Act), no such construction is

---

[11] Whether the present administrative record in this case is adequate to permit informed judicial review is a question that the Court of Appeals must determine.

possible in this case. As the Court demonstrates, the intention of Congress is clear. Accordingly, I join the opinion of the Court.

MR. JUSTICE BLACKMUN, concurring in the result.

For the reasons stated in my Brother STEVENS' dissent, I accept the Court's conclusion that the Agency's determination in this case constituted "final" action. The opaque language of § 307 (b)(1) and the scant attention it received by Congress, however, leave me in doubt concerning Congress' true intention with respect to the scope of direct appellate review. Like my dissenting Brethren, I find it difficult to believe that Congress would undertake such a massive expansion in the number of Agency actions directly reviewable by the courts of appeals without some palpable indication that it had given thought to the consequences. Nonetheless, I agree with the Court that the dearth of evidence to the contrary makes its broad interpretation of the statute inescapable. On this legislative record, we must leave to Congress, should it be so inclined, the task of introducing some clear limitation on appellate jurisdiction over review of informal Agency determinations like the one now before us.

MR. JUSTICE REHNQUIST, dissenting.

The effort to determine congressional intent here might better be entrusted to a detective than to a judge. The Court rejects the application of the traditional canon of *ejusdem generis* to the phrase "any other final action" on the grounds that (1) there is no uncertainty as to the meaning of that phrase, *ante,* at 588, and (2) at least one of the provisions now included in § 307 (b)(1), 42 U. S. C. § 7607 (b)(1) (1976 ed., Supp. II)—*i. e.,* § 112 (c), 42 U. S. C. § 7412 (c) (1976 ed., Supp. II)—does not require the Administrator to act after notice and opportunity for comment or hearing, *ante,* at 588. While I agree with the Court that the phrase "any other final action" may not by itself be "ambiguous," I think that what

we know of the matter makes Congress' additions to § 307 (b)(1) in the Clean Air Act Technical and Conforming Amendments of 1977 no less curious than was the incident in the Silver Blaze of the dog that did nothing in the nighttime. If I am correct in this, we must look beyond the language of the phrase "any other final action" in ascertaining congressional intention. The Court did just that in *Chemehuevi Tribe of Indians* v. *FPC,* 420 U. S. 395 (1975).

Before 1977, § 307 (b)(1) granted exclusive jurisdiction to courts of appeals to review only a limited class of actions taken by the Administrator.[1] *District of Columbia* v. *Train,* 175 U. S. App. D. C. 115, 119, 533 F. 2d 1250, 1254 (1976); *Utah Power & Light Co.* v. *EPA,* 180 U. S. App. D. C. 70, 72, 553 F. 2d 215, 217 (1977). The EPA was required to provide for notice and an opportunity for hearing or comment with respect to all such actions. These procedural requirements generally result in the creation of an administrative record

---

[1] The section originally provided:

"A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard under section 112, any standard of performance under section 111, any standard under section 202 (other than a standard required to be prescribed under section 202 (b)(1)), any determination under section 202 (b)(5), any control or prohibition under section 211, or any standard under section 231 may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 110 or section 111 (d) may be filed only in the United States Court of Appeals for the appropriate circuit. Any such petition shall be filed within 30 days from the date of such promulgation or approval. . . ." Pub. L. 91–604, 84 Stat. 1708.

It was inserted by the Senate, S. 4358, 91st Cong., 2d Sess., § 308 (1970), to "specify forums for judicial review of certain actions of the [EPA] Secretary. . . ." H. R. Conf. Rep. No. 91–1783, p. 57 (1970). The House bill did not contain a comparable provision. *Ibid.* In 1974, §§ 119 (c)(2)(A), (B), and (C) and the phrase "regulations thereunder" were added to the list of actions reviewable under § 307 (b)(1). Pub. L. 93–319, 88 Stat. 259.

that is more susceptible of judicial review by courts of appeals than actions such as the one in this case in which no notice and opportunity for comment are required.[2]  Indeed, it has been stated: "The requirements that interested persons have an opportunity at least for written comment and that the agency provide a general statement of reasons virtually assure that an appellate court will have a meaningful record to review.  While it is true that in many instances informal adjudication also produces an administrative record, the nature and scope of the records vary widely from one type of action to another and cannot provide the same assurance that appellate review will be feasible."  Currie & Goodman, Judicial Review of Federal Administrative Action: Quest for the Optimum Forum, 75 Colum. L. Rev. 1, 57 (1975).  Thus the grant of exclusive jurisdiction to courts of appeals in pre-1977 § 307 (b)(1) actions fully comports with the traditional role of appellate courts in reviewing agency decisions that are based on development of factual issues by means of an administrative record.[3]

The revision of § 307 (b)(1) during the Clean Air Act Amendments of 1977, when Congress added the phrase "any other final action," does not in my view support the Court's

---

[2] At the Senate debates on S. 4358, Senator Cooper stated that decisions of the EPA made after on-the-record development of "technical and other relevant information necessary to achieve a sound judgment . . . should be reviewable in the court of appeals so that the interests of all parties can be fully protected.  With the record developed by the [EPA] Secretary, the court, as an unbiased, independent institution, is the appropriate forum for reviewing such decision and making a judgment as to its quality."  116 Cong. Rec. 33117 (1970).

[3] "Direct appellate review of *formal* administrative adjudications . . . has long been standard practice: because the agency's action is to be judged by the administrative record, there is no need for a trial, and thus no need for prior resort to a district court."  Currie, Judicial Review Under Federal Pollution Laws, 62 Iowa L. Rev. 1221, 1232 (1977) (emphasis added).  See also Currie & Goodman, Judicial Review of Federal Administrative Action: Quest for the Optimum Forum, 75 Colum. L. Rev. 1, 5–6 (1975).

construction of that phrase as a major expansion of Congress' original limited grant of exclusive jurisdiction to federal courts of appeals. The amendment added only § 120, 42 U. S. C. § 7420 (1976 ed., Supp. II), to the list of those specifically enumerated in § 307 (b)(1), and it also included the "any other final action" phrase. Pub. L. 95–95, 91 Stat. 776. Section 120 does not depart from the requirement of notice and opportunity for comment or hearing that existed prior to 1977 with respect to the other sections specifically enumerated in § 307 (b)(1). It directs the EPA to give notice and an opportunity for public hearing before adopting the authorized regulations. And in adding the phrase "any other final action" Congress gave no indication whatsoever that it intended to make reviewable in the courts of appeals actions that differed substantially in character from those authorized by § 120 and the other sections listed in § 307 (b)(1). Instead, the limited legislative history on the subject suggests that the amendment was aimed at resolving problems of venue under the section, not at effecting a major jurisdictional shift from the district courts to courts of appeals.[4]

If Congress had done nothing more than enact this amend-

---

[4] The only discussion of the 1977 addition to the Clean Air Act, § 307 (b)(1), states that the amendment was "intended to clarify some questions relating to *venue* for review of rules or orders under the act." H. R. Rep. No. 95–294, p. 323 (1977) (emphasis added). The House Report noted that "in adopting this subsection, the committee was in large measure approving the portion of the Administrative Conference of the United States recommendation Section 305.76–4 (A) [41 Fed. Reg. 56768 (1976)], that deals with venue," and that the proposed amendment also "incorporates recommendation D2 of the Administrative Conference on extending the period for petitioning for judicial review in the court of appeals." *Id.*, at 324. It further stated that it did not endorse the remainder of the Administrative Conference's recommendations, *ibid.*, which include a recommendation that proposed expanding the jurisdiction of the courts of appeals by eliminating the exception to review in those courts for regulations adopted under § 202 (b)(1), 42 U. S. C. § 7521 (b)(1) (1976 ed., Supp. II).

ment, I doubt that the Court would find application of the rule of *ejusdem generis* problematic. See *infra,* at 601. The difficulty in ascertaining Congress' intention here arises from the so-called "technical amendments" enacted three months after Congress adopted the Clean Air Act Amendments in 1977. Clean Air Act Technical and Conforming Amendments of 1977, Pub. L. 95–140, 91 Stat. 1404. The amendments purportedly made no substantive changes in the earlier amendments.[5] They nonetheless altered § 307 (b)(1) by specifying four additional sections that would trigger the original jurisdiction of courts of appeals: § 111 (j), 42 U. S. C. § 7411 (j) (1976 ed., Supp. II); § 112 (c), 42 U. S. C. § 7412 (c) (1976 ed., Supp. II); § 113 (d), 42 U. S. C. § 7413 (d) (1976 ed., Supp. II); and § 119, 42 U. S. C. § 7419 (1976 ed., Supp. II). EPA maintains that these additions make no substantive changes because the "any other final action" phrase already included actions under these sections, and under the Court's interpretation of that phrase this would clearly be the case. This view, however, also leads to the conclusion that the technical amendments were a largely meaningless exercise of Congress' legislative authority. But, as previously noted, in presenting the technical amendments, Senator Muskie said they were *"necessary* to correct technical errors or unclear phrases." 123 Cong. Rec. 36252 (1977) (emphasis added); n. 4, *supra.* Thus, the technical amendments, coupled with Senator Muskie's statement in introducing them, present this Court with a paradox in attempting to ascertain Congress' intention: under the Court's interpretation of the phrase "any other final action" the technical amendments, contrary to their advance billing, were entirely unnecessary because the phrase

---

[5] In a statement explaining the amendments, Senator Muskie stated that "[i]t is not the purpose of these amendments to re-open substantive issues in the Clean Air Act." 123 Cong. Rec. 36252 (1977). Rather, he continued, "[o]nly those amendments that are necessary to correct technical errors or unclear phrases have been retained in the package of amendments that is now before the Senate." *Ibid.*

clearly includes those sections. But if "any other final action" means anything less than the Court's interpretation, then the technical amendments, again contrary to their stated purpose, made important substantive changes to § 307 (b)(1).[6] The Court attempts, partially and unsuccessfully, to address the difficulty here in a footnote, when it acknowledges that under its interpretation the technical amendments were "unnecessary." That response, however, does not answer the question: It merely restates it. The Court adds only the additional observation that "[t]his may be true, but the fact remains that even if Congress had intended the phrase 'any other final action' to be read . . . in accordance with the rule of *ejusdem generis,* there still would have been no necessity to add to the list of specifically enumerated provisions." *Ante,* at 589, n. 6.

In my view, absent any clear indication to the contrary, the statute should not be construed as creating a broad expansion of the jurisdiction of the federal courts of appeals. Such an approach is quite appropriate in this case because the jurisdictional expansion wrought by the Court is thoroughly inconsistent with the traditional role of appellate courts. Indeed, I think it is difficult to believe that Congress would adopt a massive shift in jurisdiction from the district courts to the courts of appeals without any comment whatsoever. The sketchy legislative history here indicates that Congress considered the Administrative Conference's recommendations and that the principal purpose of the 1977 amendment was to effect the change in venue that was recommended by the Administrative Conference. The change would be far less sub-

---

[6] Section 112 (c) does not make any provision for notice and comment or hearing. And, while §§ 111 (j) and 119 (a) generally provide for notice and hearing, they do not do so in every case. Under § 111 (j), an order *denying* a waiver apparently may be made by the Administrator without formal proceedings, and under § 119 (a), the Administrator apparently may *deny* an application for a primary nonferrous smelter order without providing for notice and hearing.

stantial than the jurisdictional shift that according to the Court Congress adopted *sub silentio.* And the remarks made at the time the technical amendments were adopted, coupled with the nature of the actions reviewable under § 307 (b)(1) prior to that time, are sufficiently perplexing that in my view the technical amendments do not shed any meaningful light on Congress' intention in adding the phrase "any other final action" to § 307 (b)(1). Accordingly, even though they be labeled "technical amendments" I think they are most accurately viewed as subsequent legislative history that is not controlling in interpreting a prior enactment. See *United Air Lines, Inc.* v. *McMann,* 434 U. S. 192, 200, n. 7 (1977). Indeed, to one not acquainted with the significance of the expansion of jurisdiction of courts of appeals urged by the EPA and adopted by the Court, the technical amendments most likely looked like minor additions to § 307 (b)(1). Thus, I think the most sensible way to interpret the phrase "any other final action" is to do so by reference to § 307 (b) (1) at the time that phrase was enacted, rather than at the subsequent time at which the technical amendments were added.

If the phrase "any other final action" is interpreted by reference to § 307 (b)(1) at the time the phrase was added, this case is clearly a proper one in which to apply the rule of *ejusdem generis.* The rule of *ejusdem generis* ordinarily "limits general terms which follow specific ones to matters similar to those specified." *Gooch* v. *United States,* 297 U. S. 124, 128 (1936). It rests on the notion that statutes should be construed so that the "sense of the words . . . best harmonizes with the context and the end in view." *Ibid.* At the time the general language "any other final action" was adopted, notice and opportunity for comments or hearing were required for the actions listed in the sections that preceded it—a requirement that distinguished those sections from the Administrator's action at issue here. Thus under the principle of *ejusdem generis,* the general phrase refers to similar types

of actions. This interpretation offers the most satisfactory explanation for Congress' curious failure to provide any indication that it intended to effect a major jurisdictional change in the manner of reviewing EPA actions such as the one before us, a change that is inconsistent with the traditional role of appellate courts. In a case where the construction of legislative language such as this makes so sweeping and so relatively unorthodox a change as that made here, I think judges as well as detectives may take into consideration the fact that a watchdog did not bark in the night.

MR. JUSTICE STEVENS, dissenting.

From May 1976 through June 1977, respondent PPG Industries, Inc. (PPG), exchanged a series of letters with various officials of the Environmental Protection Agency concerning the applicability of certain federal performance standards to PPG's waste-heat boilers at its Lake Charles, La., plant. PPG took the position that its boilers were not required to meet these standards, first, because construction had begun on them prior to the effective date of the standards and, second, because waste-heat boilers are not within the category of sources to which the standards in question apply.[1]

In April 1977 PPG submitted a formal request, pursuant to 40 CFR § 60.5 (a), for a definitive determination on these issues. Although § 60.5 (a) provides for such determinations only with respect to the first issue raised by PPG,[2] EPA's Regional Administrator apparently rejected both arguments

---

[1] PPG also had questions about compliance in the event that the standards were found to apply.

[2] Title 40 CFR § 60.5 (a) (1979) provides:

"When requested to do so by an owner or operator, the Administrator will make a determination of whether action taken or intended to be taken by such owner or operator constitutes construction (including reconstruction) or modification or the commencement thereof within the meaning of this part."

in her June 1977 response, unequivocally stating that PPG's boilers were subject to the standards in question.

After a few more "clarifying" letters were exchanged, PPG brought two separate petitions for review of EPA's determination, filing in both the District Court for the Western District of Louisiana and the Court of Appeals for the Fifth Circuit. The Fifth Circuit dismissed the petition on the ground that review was properly had, if at all, in the District Court.

There are two issues before us today: first, whether EPA's determination constitutes "final" agency action such that any review is appropriate and, second, if so, whether that review must be had in the Court of Appeals because the determination constituted "any other final action" within the meaning of § 307 (b)(1) of the Clean Air Act, 42 U. S. C. § 7607 (b) (1) (1976 ed., Supp. II). While I accept the Court's holding that the Agency's determination constituted "final" action as that term is ordinarily used under the Administrative Procedure Act, I am not persuaded that Congress intended exclusive review of this type of action in the courts of appeals.

In *Abbott Laboratories* v. *Gardner,* 387 U. S. 136, 149–156, this Court set out three tests that informal agency action must meet in order to be considered final agency action that is ripe for judicial review. First, the action must involve an issue that is appropriate for judicial review, such as a purely legal question. Second, it must be a definitive statement of the agency's position and not merely a tentative view or the opinion of a subordinate official. Finally, the party seeking review of the action must be faced with serious hardship if he is not allowed to obtain pre-enforcement review. In *Abbott Laboratories* itself the third requirement was satisfied by the fact that the affected companies either had to expend substantial amounts of money to comply with the regulation or not comply and risk serious criminal and civil penalties.

Although informal advice by agency personnel as to how the agency is likely to react to a particular set of circumstances

will not ordinarily be subject to judicial review under the *Abbott Laboratories* tests, this case would seem to be an exception. As EPA argues, the only issue to be decided is whether certain regulations apply under the facts submitted to the Agency by PPG. Second, the Regional Administrator of EPA herself signed the letter rejecting PPG's position; thus, it appears to be, as the Court suggests, the Agency's "last word" on the issue. *Ante,* at 586.[3] And finally, although the parties have not informed us of the magnitude of PPG's estimated compliance costs, it appears that PPG would have to risk sizeable penalties under 42 U. S. C. §§ 7413 (b), (c), and 7420 (1976 ed., Supp. II) in order to challenge EPA's determination in enforcement proceedings.[4]

Assuming that EPA's letter in this case would constitute "final agency action" under the APA, the second question is whether we are compelled by the language of § 307 (b)(1) to hold that the Court of Appeals had exclusive jurisdiction to

---

[3] The Court relies exclusively on this factor, along with the fact that the parties agree that the action is "final." I would not place much reliance on the parties' agreement, however, since they share a common interest in having the threshold jurisdictional question resolved in the affirmative. Thus, it serves PPG's interests to treat EPA's letter as a final action because PPG wants judicial review as soon as possible. It also serves EPA's interests because broadening the category of agency actions that are final and reviewable only in the courts of appeals increases the number of agency actions that cannot be challenged in enforcement proceedings under the Act. See *infra,* at 605.

[4] See *National Automatic Laundry & Cleaning Council* v. *Shultz,* 143 U. S. App. D. C. 274, 281, 443 F. 2d 689, 696 (1971), in which the court held a letter signed by the Wage-Hour Administrator concerning a particular application of the Fair Labor Standards Act to be "final action" in light of the fact that noncompliance with the agency's policy could have led to criminal liability and actions for double damages by affected employees. But see *West Penn Power Co.* v. *Train,* 522 F. 2d 302, 310–311 (CA3 1975), cert. denied, 426 U. S. 947; 522 F. 2d, at 317–319 (Adams, J., dissenting), where the court refused to consider a notice of violation issued pursuant to the Clean Air Act to be final agency action despite the severe penalties that could have attached to future noncompliance.

review that action. As MR. JUSTICE REHNQUIST points out in his dissent, such a construction of the statute will greatly increase the burdens currently borne by the courts of appeals, both in terms of numbers of cases and difficulty of issues presented.[5] *Ante*, at 596–597, 600–601. In my view, it will also distort the concept of final agency action by giving EPA virtually unlimited discretion to transform its informal advice into final agency action subject to court of appeals review.

Under § 307 (b) (2) of the Clean Air Act, any agency action that was reviewable in the courts of appeals cannot be challenged in an enforcement proceeding, whether or not review was actually sought.[6] Under § 307 (b) (1), a petition for review must be filed within 60 days of the publication of the agency action in the Federal Register. Although EPA apparently did not publish letters like its letter to PPG in the Federal Register prior to the Clean Air Act Amendments of 1977, it is now embarking on a program to do so.[7] Because

---

[5] Whether or not the record in this case was sufficiently developed for purposes of court of appeals' review (an issue on which the parties differ), it is clear that there will be many cases involving informal EPA action in which the "record" on which the Agency relied in making its determination will be minimal.

[6] Section 307 (b) (2) of the Clean Air Act provides:

"Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement."

[7] In EPA's brief in the Court of Appeals, it took the position that, by adding "any other final action" to § 307 (b) (1), Congress intended to require the Agency to give notice in the Federal Register of each and every "final action" it takes, contrary to its prior practice. Although the Agency noted that it had not yet begun complying with this obligation, it stated that it intended to begin publication in the near future of all final agency actions taken since the 1977 amendments. Brief for Respondents in No. 77–2989 (CA5), pp. 27–29. EPA's interpretation of the Federal Register clause as a requirement that notice of final determinations be given seems backwards to me. I think a more plausible interpretation of the statute is that Congress intended the term "final agency action" to

publication may give the Agency the benefit of the preclusive effect of § 307 (b)(2), it has every incentive to notice a wide range of actions in the Federal Register.

Once notice of an action has been published in the Federal Register, it would be difficult to argue that it was not "final" agency action. Most of the determinations would, like this one, concern applications of particular regulations to undisputed fact situations. Second, the very fact that the Agency had published its position would indicate that it was a definitive statement of agency policy. And finally, the requirement that an aggrieved person show some hardship entitling him to pre-enforcement review would also seem to be satisfied by mere publication, since the failure to raise the issue might well foreclose future review entirely.[8]

I find it difficult to believe that Congress intended this highly undesirable result. Although I do not share MR. JUSTICE REHNQUIST's interpretation of the statute, I would construe it as drawing a line short of allowing EPA complete discretion to turn anything it chooses into final action reviewable only in the courts of appeals.

Section 307 (b)(1) mandates exclusive review in the courts of appeals of the Administrator's actions under certain specific subsections of the Act. Those subsections contain specific grants of authority to the Administrator to make certain determinations. Thus, §§ 110 and 111 (d), 42 U. S. C. §§ 7410 and 7411 (d) (1976 ed., Supp. II), empower the Administrator to approve state implementation plans; §§ 111 (j), 112 (c), 113 (d), and 119, 42 U. S. C. §§ 7411 (j), 7412 (c), 7413 (d),

refer only to the types of actions that EPA was accustomed to publishing in the Federal Register prior to the 1977 amendments.

[8] The hardship determination, of course, becomes circular, since there is no preclusion unless there is "final" agency action and no finality unless there is some hardship in not according pre-enforcement review. Under these circumstances, the courts are likely to emulate the Court's approach in this case, ignoring the hardship component entirely and making reviewable any action that constitutes a definitive statement of the Agency's position.

and 7419 (1976 ed., Supp. II), empower the Administrator to grant (and by necessary implication to deny) waivers to companies that are unable to comply with the applicable standards; and § 120, 42 U. S. C. § 7420 (1976 ed., Supp. II), sets up a procedure through which the Administrator is to assess noncompliance penalties, after notice and hearing on the record. Each of these types of agency action has an immediate impact on the legal rights of the affected party.

By contrast, agency advice as to whether or not particular sources are subject to previously promulgated regulations does not, in itself, change any party's legal status; nor is there anything in the statute that specifically requires or permits the Administrator to give such advice. This does not mean that it is beyond the Administrator's power to do so or to set up his own procedures, as he has done in 40 CFR § 60.5 (a) (1979), for giving advice in a formalized manner. But I do not believe Congress intended the review provisions of the statute to cover this type of "agency action" as well as those types specifically contemplated by the statute. In making reviewable "any other final action of the Administrator under this chapter," Congress must have been thinking of actions it had specifically directed or authorized the Administrator to take under sections of the Act not specifically enumerated in § 307 (b)(1). This interpretation is consistent with both an *ejusdem generis* construction of the statute and its plain language. It is also supported by Congress' apparent belief that it was extending court of appeals review only to the types of actions that EPA had been accustomed to publishing in the Federal Register. See n. 7, *supra*.

Accordingly, I respectfully dissent.