[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 07-10693

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
June 13, 2008
THOMAS K. KAHN
CLERK

LOUISIANA-PACIFIC CORPORATION,

Petitioner,

versus

U.S. ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

_____

Petition for Review of a Decision of the
United States Environmental Protection Agency

_____

**(June 13, 2008)**

Before ANDERSON, BLACK and HILL, Circuit Judges.

PER CURIAM:

Petitioner Louisiana-Pacific appeals from a determination by the U.S.

Environmental Protection Agency ("EPA") that a proposed system at a Louisiana-Pacific plant in Alabama is subject to the New Source Performance Standards ("NSPS") promulgated by the EPA under section 111 of the Clean Air Act. The EPA determined that petitioner's proposed system for a new oriented strand board ("OSB") mill is a steam generating unit subject to NSPS Subpart Db, and does not qualify for the process heater exception from the steam generating unit definition. Petitioner argues on appeal that the EPA's determination is arbitrary and capricious.

## I. FACTS

Petitioner's proposed system is for the manufacture of OSB, a building material with applications similar to plywood. OSB is created by mixing wood flakes with resin and wax, and then using pressure and heat to compress the mixture into sheets. At issue in this case is the system used to dry the wet wood flakes before they are combined with the resin and wax.

The drying system has two bark burner units, each with a heat input of 187 million BTU/hour. The burners consume wood waste from debarking and flake screening. The exhaust from each of the bark burners is routed to a secondary air chamber, from which a significant portion (approximately 85%) of the exhaust gas is sent to rotary dryers. The rotary dryers are large rotating steel tubes that dry the

wood flakes by circulating the hot exhaust gas around them. The exhaust gas passes through pollution reduction technologies before being released into the atmosphere. The balance (15%) of the exhaust gas from the bark burners is sent to a thermal oil heater. The oil is heated by the exhaust gas and then routed to the forming press for the OSB. The exhaust gas from the thermal oil heater is recombined with the bark burner exhaust to heat the rotary dryers.

In December 2005, petitioner requested an applicability determination from the EPA, to ascertain if NSPS Subparts Db or Dc would apply to the proposed OSB system. If the EPA determined that the NSPS did apply to the system, petitioner would have to meet more stringent pollution standards. The parties exchanged follow-up correspondence throughout 2006, and in December 2006, the EPA issued its determination that NSPS Subpart Db does apply to the proposed system. Petitioner now appeals this determination.

## II.   DISCUSSION

The Clean Air Act provides for the direct appeal of applicability determinations to the United States Court of Appeals for the appropriate circuit. 42 U.S.C. § 7607(b)(1) (2006); Harrison v. PPG Indus., Inc., 446 U.S. 578, 586-89, 100 S. Ct. 1889, 1894-96 (1980). The system at issue in this case is located at a Louisiana-Pacific plant in Alabama, giving this Court jurisdiction over this direct

3

appeal from the EPA.

We review EPA determinations pursuant to the Clean Air Act under an arbitrary and capricious standard of review. 42 U.S.C. § 7607(d)(9)(A) (2006). Agency actions are arbitrary and capricious when the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Motor Vehicles Mfrs.' Ass'n v. State Farm Auto. Ins. Co., 463 U.S. 29, 43, 103 S. Ct. 2856, 2867 (1983). Courts will defer to an agency's interpretation of its own regulations if the interpretation is not clearly erroneous or inconsistent with the regulation's plain language. Auer v. Robbins, 519 U.S. 452, 461, 117 S. Ct. 905, 911 (1997).

The 1970 Clean Air Act Amendments authorized the EPA to regulate emissions from stationary sources. 42 U.S.C. §§ 7411, 7412 (2006). The emissions standards apply to new or modified sources. 42 U.S.C. §§ 7411(a)(2), 7412(a)(4) (2006). Under the 1970 Amendments, the EPA must issue national emissions standards for hazardous air pollutants and new source performance standards ("NSPS"). Id. §§ 7411(f), 7412(d). At issue in this case is the NSPS for

industrial-commercial-institutional steam generating units, NSPS Subpart Db.

Under NSPS Subpart Db, new steam generating units with a heat input capacity of 100 million BTU/hour or more are subject to the NSPS. 40 C.F.R. § 60.40b(a) (2007). The regulations define "steam generating unit" as:

> a device that combusts any fuel or byproduct/waste to produce steam or to heat water or any other heat transfer medium. This term includes any municipal-type solid waste incinerator with a heat recovery steam generating unit or any steam generating unit that combusts fuel and is part of a cogeneration system or a combined cycle system. This term does not include process heaters as they are defined in this subpart.

Id. § 60.41b (2007). Process heater is defined as: "a device that is primarily used to heat a material to initiate or promote a chemical reaction in which the material participates as a reactant or catalyst." Id. Thus, steam generating units that can be classified as process heaters are exempted from the NSPS requirements.

In this case, the EPA determined that petitioner's proposed OSB system was a steam generating unit under the regulations and did not meet the definition of process heater, so as to qualify for the exception. Therefore, the EPA determined that the system was subject to NSPS Subpart Db. Petitioner contends that the EPA erred both in deciding that the OSB system was a steam generating unit and in finding that the system did not meet the definition of process heater. We consider each of these contentions below.

5

A.     Steam Generating Unit

The EPA determined that petitioner's proposed system fit the definition of steam generating unit because the bark burners combust fuel which is used to heat the oil in the thermal oil heater, making it a "device that combusts . . . fuel . . . to heat water or any other heat transfer medium." Petitioner conceded that if the thermal oil heater had an independent combustion source, it would meet the steam generating unit definition. On the other hand, the EPA acknowledged that the process dryers (i.e., the bark burners and rotary dryers) would not meet the steam generating unit definition if they existed in isolation from the thermal oil heater. Petitioner contends that the EPA was arbitrary and capricious in deciding that the process dryers and thermal oil heater together constitute a steam generating unit.

Essentially, the EPA has determined that because part of the system is a steam generating unit subject to the NSPS, the entire system is subject to the NSPS. Petitioner has not demonstrated that this determination is contrary to any statute, regulation, or other binding authority. We cannot conclude that it is arbitrary and capricious for the EPA to treat the entire system as subject to stricter standards when at least a substantial part of the system meets the steam generating unit

6

definition.[1]  Therefore, we uphold the EPA determination on this point.

B.    Process Heater

EPA regulations define an exempt process heater as "a device that is primarily used to heat a material to initiate or promote a chemical reaction in which the material participates as a reactant or catalyst."  40 C.F.R. § 60.41b (2007).  The EPA concluded that the Louisiana-Pacific system did not qualify for the process heater exemption because the agency did not "believe that the wood flakes are heated to initiate or promote a chemical reaction in which the flakes are participating as a reactant or catalyst."  Petitioner argues that the EPA failed to consider two arguments in reaching this conclusion.  First, petitioner contends that it argued to the EPA that chemical reactions occur in the wood flakes when they are heated in the dryers.  Second, petitioner asserts that it argued to the EPA that the wood flakes were dried to facilitate the later, "downstream" chemical process of bonding with resin to form OSB panels.  Thus, petitioner argues that the EPA decision is arbitrary and capricious because it entirely failed to consider these two

_____

[1]Petitioner also argued, in regard to both the steam generating unit and process heater definitions, that the EPA's determination in this case was inconsistent with prior applicability determinations.  We recognize that these determinations are not binding on the EPA in subsequent cases.  See 40 C.F.R. § 60.6(c) (2007).  Having nevertheless examined the applicability determinations presented by petitioner, we find them to be sufficiently distinguishable from the present case that the EPA did not act arbitrarily and capriciously by not following them here.

important aspects of the issue.

Initially, we note that the EPA decision in this case devoted only two sentences to addressing petitioner's arguments that its system fell within the process heater exception from the definition of a steam generating unit. Those two sentences provided as follows:

> The Agency disagrees with the LP argument that the bark burner/rotary dryer/thermal oil heater system is not a "steam generating unit" because the rotary dryer is a "process heater." The Agency does not believe that the wood flakes are heated to initiate or promote a chemical reaction in which the flakes are participating as a reactant or catalyst.

The problem we have with the EPA decision is that it fails to explain why the Agency does not believe that the wood flakes are heated to initiate or promote a chemical reaction in which the flakes are either a reactant or catalyst. In its brief to this court, the EPA responded as follows. With respect to petitioner's first argument – that the EPA failed to address its argument that chemical reactions occurred in the wood flakes during the dryer process – the EPA acknowledges that the argument was preserved below, but notes that the definition of a "process heater" requires not merely that the wood flakes act as a reactant or catalyst in a chemical reaction, but requires that the primary purpose of the system be to heat the wood flakes to initiate or promote a chemical reaction in which the wood flakes act

8

either as a reactant or a catalyst. The EPA argues that petitioner has admitted that the system's primary purpose is merely to dry the wood flakes, and therefore the primary purpose cannot be to initiate or promote a chemical reaction. After a careful review of the administrative record and of petitioner's initial brief on appeal, we cannot conclude that petitioner has conceded that the primary purpose of the system is merely to dry the wood chips. Our review of the record persuades us that petitioner did fairly present to the EPA the argument that the definition of "process heater" was satisfied, and that the initiation or promotion of the requisite chemical reaction during the drying process was its primary purpose. Our problem is we do not know whether the EPA addressed this argument at all; and if it did, we do not know why the EPA rejected the argument.

With respect to petitioner's second argument – that the purpose of the system was to heat the wood flakes to initiate or promote a downstream chemical reaction in which the wood flakes would participate as a reactant or catalyst in bonding with the resin and other elements in the press to form the OSB panels – the EPA's brief to this Court argues that the issue was waived because petitioner failed to present it below. However, our review of the record reveals that it was presented below. See, for example, Documents 2 and 10. Again, we do not know if the EPA addressed this argument; and if it did we do not know why the argument was

rejected.

For the foregoing reasons, we conclude that the EPA decision is arbitrary and capricious, in that it entirely failed to consider these two important aspects of the matter. Accordingly, we vacate the EPA decision with respect to its rejection of petitioner's arguments that its system falls within the definition of a "process heater," and therefore is excepted from the definition of a "steam generating unit."

## III.    Conclusion

In summary, we cannot conclude that the EPA was arbitrary and capricious in rejecting the petitioner's argument that it should be excepted from the definition of a steam generating unit because a large part of its system would not fall within that definition if it existed in isolation from the thermal oil heater. To that extent, we affirm the decision of the EPA. However, for the reasons stated above, we vacate the decision rejecting petitioner's arguments that it falls within the process heater exception, and we remand for the EPA to address petitioner's two arguments in that regard.

AFFIRMED IN PART, VACATED IN PART, and REMANDED.