**IRON ARROW HONOR SOCIETY, a "tap" or recognition association for men; and John I. Benedict, individually and as Chief of Iron Arrow Honor Society, Plaintiffs,**

v.

**Shirley M. HUFSTEDLER, Secretary of the Department of Education; William H. Thomas, Director, Office for Civil Rights, Department of Health, Education and Welfare (Region IV) et al., Defendants.**

No. 76–1850–Civ–EPS.

United States District Court, S. D. Florida, Miami Division.

Aug. 12, 1980.

Elizabeth Du Fresne, Du Fresne & Du Fresne, Miami, Fla., for plaintiffs.

Alexander Ross, Dept. of Justice, Washington, D. C., for defendants.

## ORDER AND MEMORANDUM OPINION

SPELLMAN, District Judge.

Early in the morning, while the sky is still pale with night and the dew still wet on the grass, Iron Arrows begin to congregate at the tapping mound. There, on a small knoll beneath a shady ficus tree is the Iron Arrow monument. A few sticks of wood are placed in the firebowl, and soon the smell of smoke begins to drift across the campus. It is the tapping day. (Plaintiffs' Complaint, p. 3).

Thus begins the tapping ceremony of the Iron Arrow Honor Society, an organization steeped in tradition and proud of its long association with the University of Miami. A major part of the tradition of the organization is its male—only membership policy. With the inexorable movement toward recognition and advancement of women's rights in the past decade, Iron Arrow's exclusive membership policy has naturally met strong opposition and hostility, yet the organization has steadfastly refused to admit women, even when the federal government's threatened withdrawal of access to the federal fisc forced the University of Miami to disassociate itself from Iron Arrow. Resisting this intrusion by the federal government, which was apparently intended through indirection to work a transformation in the sexual attitudes of Iron Arrow, the organization has instead fought back by filing the present action.

In this action, the plaintiffs seek to enjoin the federal defendant from issuing or interpreting its Regulation 86.31(b)(7) in such a

way as to deter the University of Miami from permitting the Iron Arrow Honor Society to conduct certain functions on the University campus. The plaintiffs also seek a declaration of their rights with regard to the issuance and enforcement of Regulation 86.31(b)(7). Jurisdiction is founded on 28 U.S.C. §§ 1331 and 2201, 20 U.S.C. § 1683, and 5 U.S.C. § 701, et seq.

This suit was originally brought by the plaintiffs in October, 1976 against defendants Department of Health, Education, and Welfare (hereafter "H.E.W.") and the University of Miami. The District Court heard the case upon the plaintiffs' demand for a temporary injunction, denied temporary relief, and subsequently dismissed the action as to the University, stating that the plaintiffs have no federal cause of action against the University. The Court also dismissed the complaint as to H.E.W. on the ground that the plaintiffs lacked standing to complain of an H.E.W. action which only indirectly affected the plaintiffs. On appeal, the decision of the District Court was affirmed as to the dismissal of the complaint against the University, but reversed as to the dismissal of the complaint against H.E.W., 597 F.2d 590 (5th Cir. 1979).

Referring to a statement made by the University which this Court has been unable to find in the record or the pleadings, the Fifth Circuit held:

> In light of the unequivocal statement of the position of the University of Miami that but for the action of the Secretary of Health, Education and Welfare it would not have and would not in the future bar the Iron Arrow Honor Society from its campus, the decision of the district court on standing of the Society is reversed.

*Id.*, at 590.

The case is presently before this Court on cross–motions for summary judgment. All the parties agree that there are no factual issues to be resolved. Despite the previous dismissal of the University defendant, the Court has *sua sponte* joined the University of Miami as an indispensable party in order to assure that adequate relief can be afforded by the decision of this Court. Fed.R. Civ.Proc. 19.

The facts are undisputed. In 1973, the Office of Civil Rights, a subdivision of H.E.W., received a personal complaint charging that Iron Arrow Honor Society (hereafter "Iron Arrow") systematically discriminated against females by excluding them from membership in the society. The complaint also charged that Iron Arrow discriminated against American Indians, both in membership policies and by adopting certain Seminole Indian customs and attire for the society's activities. H.E.W. notified the University of Miami that these complaints were being investigated, and in October, 1973 H.E.W. informed the University that the complaint as to discrimination against American Indians was not supported by the facts.

> We do not find evidence to support a claim that the Society's use of Indian ritual and appurtenances is, per se, demeaning of either Seminole or Mikasukee Indians or Indians in general. Indeed, our investigation shows that qualities of life and philosophy portrayed in the Society's ritual show Indians in what must be considered a positive or favorable light.

(Letter of William H. Thomas, Office of Civil Rights, to the University of Miami, dated October 25, 1973).

The University was simultaneously informed that consideration of the sex discrimination claim had been postponed.

> Our resolution of the sex discrimination aspect of this complaint will have to await the issuance of guidelines for the implementation of Title IX of the Education Amendments of 1972. These should be ready sometime in the fall, at which time we will pursue our investigation into the status of the Iron Arrow Society and the University's obligations to comply with the requirements of Title IX and implementing rules and regulations issued pursuant to the legislation.

*Id.*

H.E.W. regulations implementing the Title IX legislation were subsequently issued and became effective on July 21, 1975. On May 25, 1976, H.E.W.'s Office of Civil

Rights informed the University that it had concluded its investigation of Iron Arrow and found that the University was in violation of H.E.W. Regulation 45 C.F.R. 86.-31(b)(7), which states:

> ... a recipient shall not, on the basis of sex:
>
> Aid or perpetuate discrimination against any person by providing significant assistance to any agency, organization or person which discriminates on the basis of sex in providing any aid, benefit or service to students or employees: ...

H.E.W. stated to the University,

> Accordingly, we are informing you that in order for the University of Miami to fulfill its obligations under Title IX, it must either require the Iron Arrow Honor Society to eliminate its policy of excluding women or discontinue its support of the Iron Arrow Society.

(Letter of William H. Thomas, Office of Civil Rights, to the University of Miami, received May 25, 1976).

The facts relied on in the above letter for the conclusion that the University provided "significant assistance" to Iron Arrow include the following: the University's provision of secretarial services, alumni mailings, and meeting rooms to Iron Arrow; the establishment of Iron Arrow by the founding President of the University of Miami in the year that the University was founded; the signature of the President of the University on the Iron Arrow constitution; the charter issued to Iron Arrow by the University; reference in the University catalogue to Iron Arrow as "the highest recognition society for men"; the existence of a monument to Iron Arrow on a mound outside the University's student union building; other campus plaques and statutes honoring Iron Arrow and its members; the University's acquiescence in the association of the University faculty as advisors and as screening committees' for admission of new members to the society; and the Iron Arrow tapping ceremony, which was regularly conducted on the University's campus.

In June, 1976, the University requested additional time before compliance with the requirements of Title IX was ordered and requested of H.E.W. that it consider Iron Arrow's contention that it no longer received significant assistance from the University. The extension of time was granted, but reconsideration of Iron Arrow's position did not alter H.E.W.'s findings, and H.E.W.'s position with regard to seeking compliance by the University remained unchanged. (Plaintiffs' exhibit # 3).

In September, 1976, after meetings with Iron Arrow members, President Stanford of the University of Miami requested of H.E.W. an additional extension of time before any action was taken against the University. H.E.W. responded by allowing an extension until December 15, 1976, upon the condition that the campus tapping ceremony of Iron Arrow could not take place until the compliance question was resolved.

The University thereupon prohibited Iron Arrow from performing its tapping ceremony on the campus. Iron Arrow responded by bringing this lawsuit.

I.

Scope of review.

The regulation which H.E.W. relied on in seeking compliance by the University was adopted pursuant to 20 U.S.C. § 1682, which states, in pertinent part,

> Each Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract ... is authorized and directed to effectuate the provisions of section 1681 of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with the statute authorizing the financial assistance in connection with which the action is taken. ... Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been made, and shall be limited in its effect to the partic-

ular program, or part thereof, in which such noncompliance has been found .... *Provided however,* That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means.

The statute to be implemented, 20 U.S.C. § 1681, provides, in pertinent part,

(a) No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that: ...

(6) this section shall not apply to membership practices–

(A) of a social fraternity or social sorority which is exempt from taxation under section 501(a) of Title 26, the active membership consists primarily of students in an institution of higher education, or

(B) of the Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls, and voluntary youth service organizations which are so exempt, the membership of which has traditionally been limited to persons of one sex and principally to persons of less than nineteen years of age;

.     .     .     .     .

The plaintiffs present no constitutional challenge to Congress' delegation to H.E.W. of the power to adopt regulations consistent with the statutory purpose. Moreover, the regulations were issued in full compliance with provisions regarding notice and comment rule–making in the Administrative Procedure Act, 5 U.S.C. § 553, and the plaintiffs do not challenge the procedure followed in issuing Regulation 86.31(b)(7). 40 Federal Register 24128.

The plaintiffs' challenge to the regulation in question is based on the grounds that it exceeds the statutory delegation of authority, or is arbitrary, capricious, or an abuse of discretion. Plaintiffs also contend that H.E.W.'s interpretation of its regulation is unreasonable or arbitrary, and that plaintiffs were denied a hearing or other procedural safeguards available under 5 U.S.C. § 701, et seq.

Under the Administrative Procedure Act, 5 U.S.C. § 706, this Court's scope of review of administrative action is broad enough to encompass all of the relief sought by the plaintiffs including declaratory relief. The statute requires this Court, "[t]o the extent necessary to decision and where presented ... [to] decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of an agency action." 5 U.S.C. § 706.

■ This Court may not, however, simply substitute its judgment for that of the agency. H.E.W.'s regulation and its interpretation of that regulation will be upheld unless they are unreasonable, arbitrary, beyond statutory jurisdiction, or inadequately consistent with procedural requirements. 5 U.S.C. § 706; *P. P. G. Industries, Inc. v. Harrison*, 587 F.2d 237, reh. denied 591 F.2d 102 (5th Cir. 1979), reversed on other grounds 446 U.S. 578, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980); *Bank of Commerce of Laredo v. City National Bank of Laredo*, 484 F.2d 284 (5th Cir. 1973), cert. denied 416 U.S. 905, 94 S.Ct. 1609, 40 L.Ed.2d 109; *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■ Plaintiff's final jurisdictional hurdles involve the related issues of ripeness, finality of agency action and exhaustion of administrative remedies. The plaintiffs are not presently entitled to any further administrative review of their claim. 20 U.S.C. § 1682. Moreover, even if such review were available, the issuance of the challenged regulation is itself a final agency action under 5 U.S.C. § 704, and H.E.W.'s stated interpretation of the regulation is also final, given its non–reviewability by the plaintiffs other than through this lawsuit. *Romeo Community Schools v. U. S. Dept. of*

*Health*, 438 F.Supp. 1021, 1027 (E.D.Mich. 1977) affirmed 600 F.2d 581 (6th Cir. 1979). Thus, the case is appropriate for decision by this Court and the questions presented are ripe for judicial review *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

## II.

### Statutory jurisdiction for the issuance of the regulation.

■ 20 U.S.C. § 1682 authorizes certain federal agencies, including H.E.W., to issue regulations to "effectuate" the provisions of 20 U.S.C. § 1681, which prohibits sexual discrimination in any educational program or activity receiving federal assistance. The plaintiffs do not directly claim that Regulation 86.31(b)(7), enacted pursuant to § 1682, does not effectuate § 1681, but rather that "the Congress did not intend that honor and recognition societies operating, as Plaintiff, in independent orbit about a university, be denied the right to exclude persons based on sex ..." (Complaint p. 9).

This Court must examine the regulation to determine if it effectuates the substantive statute by reaching discrimination in an organization which does not directly receive federal support. To do so, it is necessary to define the effects which § 1681 is intended to bring about. Section 1681 is patterned after 42 U.S.C. § 2000d, Title VI of the Civil Rights Act, which seeks to eliminate federal support of racial discrimination in American society. The Supreme Court, in *Cannon v. University of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), found the thrust of § 1681 to be equally clear; the statute seeks to eliminate federal support of educational programs and activities which sexually discriminate against students. *Id.* at 704, 99 S.Ct. at 1961.

This goal is, in turn, part of the broader social objective of completely eliminating invidious discrimination on the basis of sex. Elimination of racial discrimination through integration in the schools has been a constant commitment of this country since 1954, *Brown v. Board of Education of Topeka*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and it was advanced by the 1964 Civil Rights Act. It is widely believed that full equality of educational rights and opportunities will lead to wide–ranging social and economic advancement by persons who have in the past been treated as second–class citizens. This belief in the power of education to eliminate the effects of past discrimination and inequalities plays an important part in the structure of American values, and this importance was reflected in the legislative history of the Title IX legislation. 1972 U.S.Code Cong. and Admin. News, p. 2462, et seq.

House Report No. 554 noted extensive discrimination by American universities in their admissions policies and also focused on the issue of discrimination suffered by women faculty at colleges and universities. *Id.* at 2512. The report emphasizes the close relationship between Title VII of the Civil Rights Act of 1964 and the present legislation, especially as it relates to equalizing employment opportunities for women. *Id.* at 2512.

This career advancement notion was reinforced by Senator Bayh's statement regarding the 1974 amendment of § 1683 to exclude social fraternities, the YMCA, YWCA, Girl Scouts, Boy Scouts, and Camp Fire Girls, as well as high school youth service groups from the statute's prohibition. "[T]his exemption covers only social Greek organizations; it does not apply to professional fraternities or sororities whose admission practices might have a discriminatory effect on the future career opportunities of a woman." Dec. 16, 1974, Cong. Record at s21568.

The defendant contends that the non–inclusion of one–sex honor societies from the 1974 exemption indicates Congressional intent to reach such organizations through §§ 1681 and 1682. While the limited nature of the exemption precludes any affirmative reading of the amendment, certainly the exemption is not inconsistent with a Congressional intent to reach sexually discrimi-

natory honor societies in close association with a university receiving federal assistance.[1]

The H.E.W. regulation 86.31(b)(7) states that educational institutions which receive federal assistance shall not perpetuate sexual discrimination by providing significant assistance to an organization which discriminates in providing any aid, benefit, or service to students. H.E.W. explained its regulation as follows in the Federal Register:

> The language in subparagraph 86.31(b)(7) has been in response to comments in order to clarify the Department's position when agencies, organizations or persons not part of the recipient would be subject to the requirements of the regulation. Some of these "outside" organizations have been exempted from Title IX with respect to their membership policies by a recent amendment to the Statute which was enacted in late 1974. This amendment is reflected, as already noted, in § 86.14 which exempts social fraternities .... Other groups, however, such as business and professional fraternities and sororities and honor societies continue to be covered. The regulation provides that if the recipient furnishes the "outside" agency or organization with "significant assistance," the "outside" agency or organization becomes so connected with the education program or activity of the recipient that any discriminatory policies or practices for which it is responsible become attributable to the recipient. [40 Federal Register 24132]

The standards articulated in H.E.W.'s explanation are more rigorous in requiring a close connection between recipient and honor society than is the nexus requirement employed in state action analysis for the purpose of enforcing the Fourteenth Amendment to private persons and organizations. See *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961).

As a matter of law, the Court finds that this regulation, though it may reach activities once–removed from direct federal assistance, is nevertheless useful and necessary to the effectuation of 20 U.S.C. § 1681, which demands an end to federal governmental support of the perpetuation of discrimination against women in educational institutions. Sexually discriminatory honor societies significantly assisted by federally supported universities perpetuate sexual discrimination. Thus, Congress' authorization of regulatory jurisdiction to effectuate 20 U.S.C. § 1681 was not exceeded by H.E.W. Regulation 86.31(b)(7), which reaches organizations that do not directly receive federal support.

### III.

Issues of vagueness, reasonableness and arbitrariness of the regulation.

■ The regulation purports to reach organizations which sexually discriminate in providing any "aid, benefit, or service" to students and to which a recipient of federal support provides "significant assistance". The two above–quoted terms are capable of widely varying interpretations. This is not necessarily an unacceptable condition of such regulations. However, if the Court were to find that these standards were so vague as to make inevitable the arbitrary enforcement of the regulation, the regulation could be struck down as being in violation of the Administrative Procedure Act, 5 U.S.C. § 706. See *PPG Industries* ..., supra. Also, if the agency enforcing the regulation interpreted these standards so unreasonably that the standards no longer guided agency discretion, the regulation could be declared invalid.

■ Neither of these problems exist as to the present regulation. Simultaneously

---

1. In light of the Fifth Circuit's recent opinion in *Dougherty County School System v. Harris*, 622 F.2d 735 at 737, this Court here notes its finding, implicit in the present opinion but apparently explicitly required by the *Dougherty* opinion, that the University of Miami is an "educational program or activity" under the terms of 20 U.S.C. §§ 1681 and 1682, and that Regulation 86.31(b)(7) was intended to and does apply only to such specific programs as, for example, universities which receive general grants of federal support.

with the promulgation of this regulation, H.E.W. established the standards which would guide its enforcement of the regulation.

H.E.W.'s explanation stated:

Thus, such forms of assistance as faculty sponsors, facilities, administrative staff, etc., may be significant enough to create the nexus and to render the organization subject to the regulation. Such determinations will turn on the facts and circumstances of specific situations.

40 Federal Register 24132.

H.E.W. also indicated that it considered honor societies within the scope of the regulation.

These interpretations eliminate much of the vagueness of the language in the regulation. Moreover, they are reasonable guides to the exercise of administrative discretion in enforcing the regulation. So long as the agency devises clear standards to guide its actions, this Court will subject agency action to scrutiny on the basis of those standards.

On the question of arbitrariness, the Court finds that the regulation is not contrary to, but is instead fully consistent with, governing statutes. The Court also finds that the regulation, as limited by H.E.W.'s interpretive explanation, is not unduly vague.

## IV.

### Application of the regulation to the present case—the issue of significant assistance.

In 1976, the University of Miami was a recipient of federal funds administered by H.E.W. Iron Arrow provided aid, benefits and services to selected students of the University of Miami. Iron Arrow openly discriminated in its admission policies and practices on the basis of sex. Thus, Regulation 86.31(b)(7) was applicable to the University's relationship to Iron Arrow if the University provided "significant assistance" to Iron Arrow.

A review by this Court fails to disclose any prior occasion where the particular regulation in question has been judicially interpreted and from which this Court could secure some guideline in dealing with the facts and circumstances surrounding this case.

In *Webster's Third New International Dictionary*, "significant" is defined as "having or likely to have influence or effect: deserving to be considered: IMPORTANT, WEIGHTY, NOTABLE (even though the individual results may seem small, the total of them is [significant]—F. D. Roosevelt."

"Significant assistance", according to H.E.W., can be of two forms: tangible support or intangible support. Tangible support includes direct financial assistance, the provision of facilities, equipment, or real property, secretarial and management services. Intangible support includes actions which identify the university with the discriminatory organization or bestow recognition upon the organization, such as provision of a faculty sponsor or advisor.

In the instant case, the Court finds its role as harbinger in seeking to interpret the term "significant assistance" and apply that term to the relationship between the University of Miami and the Iron Arrow Society to be less than an enjoyable task. Although federal jurisdiction has never extended to actions brought for dissolution-ment of marriage, this Court cannot help but feel the same burden that must be placed on chancellors who preside over such cases when it is acknowledged that the decision that must ultimately be reached will place an indelible scar on the parties before the Court. The relationship of the University and Iron Arrow can almost be described as an incestuous marriage. Not only has there existed matrimony, scheduled to culminate in a golden wedding anniversary which never took place, but Iron Arrow came from the very womb of the University of Miami, was held close to its bosom and was nurtured as a child until it became a bright, successful and outstanding member of the community, looked upon by its parent with pride and satisfaction.

As pointed out above, the determination of what is "significant" enough to create the nexus and to render Iron Arrow subject to the regulation must turn on the facts and circumstances of the specific situation—what assistance might be significant to one organization might be insignificant to another. In this regard, in analyzing the relationship which has developed over the last fifty years between the University and Iron Arrow, one cannot help but believe that in this particular regard Iron Arrow is truly placed in a "Catch 22". The success and outstanding achievement developed over the last fifty years results in this Court finding that the degree of assistance necessary to create the nexus which would bring about subjecting the organization to the regulation in question is far less than it would be if the organization had been less successful and did not enjoy the stature it has achieved. That is not to say that the assistance rendered by the University of Miami at the time this lawsuit was instituted was not in fact significant but quite the contrary.

In its letter informing the University of Miami of its noncompliance with Regulation 86.31(b)(7), H.E.W. cited a long list of tangible and intangible support, much of it of a very special or even unique nature in the relationship between Iron Arrow and the University. Although the relationship may have changed since H.E.W.'s May 25, 1976 letter, whether or not because of the demand for compliance, the relationship between Iron Arrow and the University had been and continued to be a very close one in the Spring of 1976.

The forms of assistance given by the University to Iron Arrow adduced during this lawsuit include: the use of real property located in front of the student union building in the center of the campus, called by Iron Arrow a "mound" and bearing a monument exalting Iron Arrow as "the highest honor in the University of Miami"; the existence of other plaques and statues throughout the campus recognizing Iron Arrow; the special recognition given to Iron Arrow at the University's homecoming football game; the use of the campus for Iron Arrow's tapping ceremony which takes place on the mound, a charter given to Iron Arrow by the University; the formal sponsorship of Iron Arrow by every president of the University throughout its history; the provision of secretarial services, mail boxes, mailing labels, and special meeting rooms to Iron Arrow, the existence of a faculty screening committee to propose new members to the society; and the special recognition of Iron Arrow in the University catalogue as the "highest recognition society for men."

Plaintiffs insist that they receive no direct financial support from the University of Miami. Nevertheless, Plaintiffs' complaint alleges that the loss of University supported homecoming activities involving Iron Arrow will, by itself, result in the loss of more than $10,000.00 to Iron Arrow. Defendant contends that the Plaintiffs' own complaint thus establishes significant assistance by showing how much Plaintiffs stand to lose by disassociation with the University of Miami. This Court does not accept that automatic standard for significance. Surely, significance must be judged by an objective standard, rather than the mere subjective importance the organization attaches to the assistance. However, $10,000.00 may well be objectively significant.

Furthermore, the Court wishes to disabuse the Plaintiffs of their mistaken impression that it is helpful to their cause that Iron Arrow may have "given much more than it received from the University of Miami." Such a mutually beneficial relationship tends rather to establish a closer nexus between the organization and the University. Here, Fourteenth Amendment state action doctrine provides a useful analogy. In *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), the Supreme Court held that private schools were significantly aided by the State of Mississippi's program of providing textbooks to children in private schools which racially discriminated in their admissions policies. This aid was held to violate the equal protection clause of the Fourteenth Amendment, notwithstanding the obvious

fact that the private schools saved the state from making huge increase in expenditures for public education.

Based on the facts and circumstances surrounding this case, the Court cannot help but quote the phrase attributed by *Webster* to Franklin Delano Roosevelt, *supra*, "even though the individual (assistance) may seem small, the total of them is significant." In the face of Plaintiffs' admissions and the overwhelming and undisputed evidence of continuous, significant, and occasionally uniquely significant assistance provided to Iron Arrow by the University of Miami, the Court finds as a matter of law that H.E.W. correctly informed the University of Miami in 1976 that the University was not in compliance with H.E.W. Regulation 86.31(b)(7).

### V.

H.E.W.'s enforcement procedure and its exercise of discretion to seek compliance in the present case.

■ H.E.W. chose to enforce its regulation in this case by seeking voluntary compliance by the University of Miami rather than through a formal hearing process. While a hearing might have led to an earlier resolution of this case, H.E.W. was correctly following the clear statutory mandate in 20 U.S.C. § 1682 to first attempt to induce voluntary compliance with its regulations, and then, only if that attempt fails, to begin hearings on the termination of funds. No party was denied a meaningful opportunity for review of the agency's action under the statutory procedure. This Court has given the plaintiffs an opportunity to raise all objections it has to agency action and it is clear that the plaintiffs have not been deprived of life, liberty or property without due process of law.

■ The plaintiffs have suggested that enforcement of Regulation 86.31(b)(7) as to Iron Arrow was arbitrary and discriminatory. The claim is unpersuasive. Iron Arrow is a highly appropriate subject of H.E.W. scrutiny given the purpose of Section 1681. Testimony at the hearing on Plaintiffs' demand for a temporary injunction by Judge Rhea Grossman, a witness for the Plaintiff, demonstrated the extraordinary value of Iron Arrow membership to career advancement. Judge Grossman stated that often a prospective employee's Iron Arrow membership is the only fact arousing the interest of a prospective employer.

The prestige and importance of Iron Arrow extends far beyond the campus of the University of Miami. Members of Iron Arrow have risen to prominent positions in the legal, political, business, and other professional communities in the Miami area. The present and previous mayors of the City of Miami and a former Dade County State Attorney, the University's athletic heroes, now prominent in professional sports, and many other successful and well known persons highlight the membership role of Iron Arrow. Thus, it is no wonder that Iron Arrow may be viewed as a very valuable benefit to students in terms of employment opportunity and career advancement, a benefit completely denied to women.

Iron Arrow may consider it ironic that its organization may have been singled out simply because it has been prominent and successful. Nevertheless, the Court finds that the selection of Iron Arrow for investigation, based on an unsolicited complaint from the University community was not arbitrary, but was instead fully within the progressive spirit of §§ 1681 and 1682.

### VI.

Declaratory relief.

This Court has evaluated H.E.W. Regulation 86.31(b)(7) and, as a matter of law, found it to be a proper exercise of statutory authority. The Court has also, as a matter of law, approved H.E.W.'s explanation of that regulation at 40 Federal Register 24132. The Court has found, as a matter of law, that H.E.W. correctly applied its regulation to the University of Miami in 1976. Finally, the Court has held, as a matter of law, that the enforcement procedure used by H.E.W. was proper and that the selection of Iron Arrow as a subject of investigation was not arbitrary or discriminatory.

The Court has not been presented with a sufficient factual basis to determine whether the University of Miami is now complying with Regulation 86.31(b)(7), nor is such an issue ripe for determination by this Court. However, the Court will state that should the University of Miami, at this time, decide to resume some contacts with Iron Arrow, H.E.W. could not consistently with § 1682 begin a hearing to terminate the University's general federal funding until H.E.W. had first sought voluntary compliance. Further declaratory relief on the cross–motions for summary judgment is denied.